employer that if he and Phelan were unable to control the barrel there was danger of an accident, and he also knew that the skid was not furnished for the purpose of either walking or moving about on it while supporting the weight of the barrel. We are of opinion therefore that upon no theory did the evidence require the submission of the case to the jury, and that the defendant's motion for a dismissal of the complaint at the close of the evidence should have been granted.

It follows that the judgment and order should be reversed, with costs, and the complaint dismissed, with costs. All concur.

---

### In re AMIDON. (No. 6009.)

(Supreme Court, Appellate Division, First Department. July 10, 1914.)

WILLS (§ 818*)—CONSTRUCTION—LEGACIES—COSTS.

Where testator bequeathed to L. 10 per cent. of all moneys received from China belonging to testator in lieu of all fees or other charges by L. made in obtaining the fund from the estate of testator's late brother, L. was only entitled to receive 10 per cent. of the money received by testator or his representatives on the Chinese claim after deducting the proper expenditures made in collecting the same.

[Ed. Note.—For other cases, see Wills, Cent. Dig. § 2112; Dec. Dig. § 818.*]

Appeal from Surrogate's Court, New York County.

Judicial settlement of the accounts of Georgiana M. Amidon, as executrix of the will of Henry G. Ward, deceased. Proceeding by Newbury D. Lawton, as executor of the will of Cyrus Lawton, deceased, to compel an accounting of a legacy under the will of Ward. From a Surrogate's decree directing the payment of the legacy, the executrix appeals. Decree of Surrogate reversed, exceptions to referee's report overruled, and report confirmed.

The following is the opinion of the referee:

The contest in this accounting relates to the disposition of part of a fund collected by the accounting executrix from the government of China in settlement of a claim of Gen. Frederick T. Ward, the testator's brother. The nature of the claim and the circumstances leading to its payment have a direct bearing on some of the issues presented, and the facts are so extraordinary as to invite a somewhat detailed preliminary statement.

The claim originated in events of historical importance of which I may take judicial notice. In or about the year 1850 the cruelty and oppressions of the New Emperor of China, Hien-feng, led to the Tai-ping revolt against the Manchu dynasty. The revolt began in the remote southern province of Kwang Si. Leadership of the revolt was early assumed by a religious enthusiast named Hung Siu-Tsüan. The revolt spread across China through the very populous central provinces of Hunan and Hupeh, down the valley of the Yang-tse-Kiang toward the coast and culminated in the capture by the rebels of the important city of Nanking, where the leader proclaimed himself emperor under the title "Tien Wang," meaning Heavenly King, and established his court.

The struggle against the imperial government continued for some years, and about the year 1860 the rebels threatened the coast city of Shanghai, 200 miles east of their capital, Nanking. The governor of the district, or, as he was called, the Tao-tai, was one Woo. He was charged by the government with the immediate control of the military affairs at Shanghai. At this juncture Frederick Townsend Ward, a young American, arrived in Shanghai.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Ward, though but 30 years of age, already had some military experience as a participant in Walker's daring raid into Nicaragua and as a soldier in the French Army in the Crimean War, and was shrewd, venturesome, and fearless. Woo was induced to employ him to organize a defense against the rebels. Ward at first hired for military service, under the direction and at the expense of Woo, a number of natives of the Philippine Islands, and officered his levies with Europeans enlisted at Shanghai. With this force he did some fighting. He soon, however, disbanded his Philippinos and engaged and drilled native Chinese. From time to time he increased the number of his levies until he had raised his crops to the strength of about 3,000 men. Under the terms of Ward's employment, Woo was to furnish the supplies and pay the men and to pay Ward handsomely for his services. What his precise pay was to be does not appear to be known exactly, but it seems to have been based largely on the number and importance of cities that he should capture from the rebels.

The contest continued under his generalship for about two years, and with such success that his corps came to be known as the "Ever Victorious Army." In its conduct Gen. Ward was intrusted with large sums of money by the Chinese government which he seems to have handled with integrity. He also fought with great daring and gallantry. Though wounded several times in battle, he was popularly supposed to bear a charmed life; but in September, 1862, while engaged in an assault on the town of Tsieka, he was wounded again, this time so severely that he was removed to the British warship Hardy and died on board of it the following day. Before his death he made a formal statement in the presence of witnesses, in the nature of a will, in which he declared that Woo, the Tao-tai, owed him 110,000 taels, and that Ta Kee, a Chinese government banker and treasurer of Shanghai, who had acted as paymaster of the Ward corps, owed him 30,000 taels. In this dying declaration Gen. Ward expressed the wish that the British Admiral, Sir James Hope, and the American Minister to China, Anson W. Burlingame, act as his executors. The Chinese government admired and praised Gen. Ward's services. It conferred upon him the eminent rank of Mandarin of the first class, and caused altars to be erected to his memory and paid other distinguished honors after his death. In the following years, the corps he organized, acting under the command of an English Major, was successful in putting down the rebellion, a service which brought great distinction to its commander, who in consequence become known to the world over as "Chinese Gordon."

The executors named by Gen. Ward did not qualify. After several attempts to secure administration, Mr. George F. Seward, who at the time was judge of the Consular Court and had jurisdiction as a probate court in relation to estates of American residents in Shanghai, appointed Mr. Albert Freeman of the American banking house of Hiram Fogg & Co. and resident at Shanghai to act as administrator.

Mr. Freeman made an appropriate demand on Woo and Ta Kee on the basis of the dying declaration of Gen. Ward. At first these officials admitted the correctness of the dying declaration, but pleaded a lack of funds and promised to pay the debts in a very short time. This was in the winter of 1862–63. At the same time, a large number of claims were presented against them from American merchants in Shanghai for supplies furnished the Ward corps, and these also pressed for payment. Woo made a variety of objections to the claims of these merchants, and the dispute over them finally led to the appointment of a board of arbitration consisting of two members, appointed respectively by Consul Seward and the Chinese government. Along with the claims of merchants, the claim of Gen. Ward's estate against Woo was submitted to these arbitrators. The claim of the estate against Ta Kee was not so submitted and was separately adjusted, as will be shown later.

The arbitrators rendered their decision as to the various claims of the merchants, and allowed the Ward claim against Woo at 110,000 taels, the amount stated in the dying declaration of Gen. Ward. The Chinese authorities were allowed 30 days for presentation of evidence in opposition to the claims. Pursuant to this permission, a verbal statement was made before the arbitrators in behalf of Woo that the Chinese government had incurred liability for some 30,000 taels which, as between the Ward estate and the govern-

ment, the estate ought to pay.   No documentary proofs or evidence of any kind was offered in support of this statement, and the arbitrators awarded to the Ward estate the full amount claimed.

The Chinese officials seem to have moved very deliberately after the award, and, before any payments were made in conformity to it, the Ward corps suffered a decided military reverse.   In consequence, Woo's attitude toward the claim underwent a decided change.   Woo and Ta Kee had planned on their own responsibility an expedition against Nanking, the rebel capital, and had pledged to their government a successful issue of the campaign.   The expedition was undertaken by Gen. Burgewine, Ward's immediate successor in command, and an assault on the city was made, but was unsuccessful.   Woo and Ta Kee were thereupon censured and deprived of their rank.   Regarding the Ward corps as the cause of their disgrace, these two worthies began to trump up frivolous objections and counter charges to the claim, and Woo declined to make any payment on it.

The most important of Woo's defenses to the claim was a counterclaim he set up for money due on advances made to the accountant's testator, Henry G. Ward, the brother of Gen. Ward.   The facts in regard to this counterclaim seem to be that a few months prior to the death of Gen. Ward, on his advice, the Chinese authorities employed Henry G. Ward to purchase supplies and steamers in Europe and America.   The government was to furnish him with £60,000 sterling for the purpose, payable in installments as circumstances required.   Henry G. Ward purchased in England a quantity of arms and ammunition, which were consigned to Gen. Ward, in China, and then proceeded to America, where he contracted for the building of three gunboats.   To meet these expenditures and obligations about £40,000 was furnished Henry G. Ward through Gen. Ward.   The balance of the £60,000 required was not sent him.   When Gen. Ward died, Woo and Ta Kee failed to respond to the demands of Henry G. Ward and Mr. Freeman, the administrator of Gen. Ward's estate, for the money.   In order to complete the boats, Henry G. Ward was compelled to borrow money, which he did in New York on the pledge of the vessels under construction, and, not receiving the balance required, he sold the vessels to the United States government, then likewise engaged in a civil war.   As a result of this sale, and after paying the claims against the steamers, there was a considerable balance in Henry G. Ward's hands.   Whether or not when Gen. Ward made his dying declaration he took into account the state of this affair with Henry G. Ward does not appear.   The estate claimed that he did;   Woo claimed that he did not.

Shortly after the original arbitrators had completed their award. Frederick G. Ward, the father of Gen. Ward, went to China and remained two years applying himself to the affairs of the estate and endeavoring to collect the Ward claim from the Chinese officials.   Finding that the claim would not be settled until the accounts of Henry G. Ward were passed, Frederick G. Ward wrote his son to forward these accounts.   Henry G. Ward at first refused to furnish them.   His father thereupon returned to the United States to procure them, but died on reaching San Francisco.   This was in December, 1865.   Meanwhile negotiations proceeded between Woo on the one hand and Mr. Seward, the American Consul General, on the other, in regard to payment of the claims of American merchants that had been passed by the board of arbitration, and, in consequence of Woo's strenuous objections to the former award, Mr. Seward agreed to a second arbitration.   This arbitral board rejected many of the claims of merchants that had been passed before. On the Ward claim they decided in substance that Woo produced no reasonable evidence of debt to the government by Gen. Ward, but on the other hand because of the failure of Henry G. Ward to produce his accounts the claim of the estate could not be allowed.   Prosecution of the Ward claim against Woo was thus brought to a standstill.   Subsequently Mr. Seward returned to the United States and obtained from Henry G. Ward a promise of his accounts.   His condition of health, however, never permitted him to make them up, and he died shortly after his father.   Such accounts, however, were prepared in the fall of 1867, by Jacob R. Telfair, an accountant of New York City, and showed that some 42,000 taels gold or about $68,000 remained in the hands of Henry G. Ward at his death.

The subsequent history of the claim may be briefly stated. The claim on the death of Gen. Ward seems to have passed to his father, and on the death of the latter, to his mother, sister, and his brother Henry G. Ward. The mother and sister in February, 1866, assigned their interest to Henry G. Ward, who, as we have seen, died in July of the year following. He left a will appointing his widow, Georgiana M. Ward, his executrix. The business of collecting the claim was thereafter prosecuted by the widow of Henry G. Ward who is now accounting herein. She employed successively several attorneys, memorialized Congress, and invoked the aid of our Secretaries of State in succession; but her efforts for many years met with no success. In the year 1902, however, she succeeded in engaging the professional services of the Hon. John W. Foster in the collection of her claim. Mr. Foster had been Secretary of State of the United States. He was a close personal friend of Mr. Conger, the American Minister to China, and on his advice Mr. Conger had been selected for the post. He was also a friend of Liang Cheng, a member of the Chinese Diplomatic Service, about to be appointed minister of his government to the United States. This official had been a tutor in the family of Prince Ch'ing, at that time President of the Tsung Li Yamen, or board of foreign affairs of China, and stood in close personal relations with him. At that time the United States government had in its custody a large sum of money deposited with it by the government of China under a protocol made between the two countries to meet the claims of American citizens for damages incurred in the Anti-Foreign uprising of 1901, known as the Boxer uprising. This deposit was known as the Boxer Indemnity Fund. Through Mr. Foster's efforts, Prince Ch'ing was induced to consent that the Ward claim be paid if the United States government could devise some way of making the payment from the Boxer Indemnity Fund. This fund was in excess of the claims of Americans as adjusted by our government, and there was thus a balance which our government intended to return to China. The consent of the Chinese government made it possible to settle the Ward claim out of this fund, and Secretary Hay did so. The estate received the amount claimed by Gen. Ward in his dying declaration less the amount shown by Telfair's accounts to be due China from the estate of Henry G. Ward and interest on the balance from the date of Gen. Ward's death in 1862 to the date of payment. Mr. Foster secured the allowance of the claim on the basis of the value of the tael at the time the debt was contracted, when silver was at a premium over gold. This more than doubled the award. The princely sum of $368,237 was thus arrived at.

The Chinese claim having been thus collected, the executrix has filed her account, which has now to be judicially settled. This account relates only to the Chinese fund, for she accounted many years ago for the general estate. In the present account the executrix has taken credit for expenditures made in the course of collecting the claim, for the legacy of one-sixth of the claim paid the testator's sister, and for the residue which she has paid herself as residuary legatee. She has thus ignored the claims of the estate of Cyrus Lawton to a share as legatee, and the executor of the will of Cyrus Lawton accordingly contests the account.

The claim of the estate of Cyrus Lawton arises out of the following paragraph of the will of Henry G. Ward:

"Third. I give and bequeath to my friend Cyrus Lawton ten per cent. of all moneys hereafter received from China belonging to me in lieu of all fees or other charges by him made in obtaining the same from my late brother's estate."

The Cyrus Lawton mentioned in the foregoing paragraph was an attorney of New York City, who had been employed by decedent in various matters, among others, in the affair of the gunboats that decedent built in this country for the Chinese government. Although Cyrus Lawton survived the testator many years, namely, until the year 1902, he seems to have rendered no important services after decedent's death in the prosecution of the claim against China, and he collected nothing on account of it.

The accounting executrix claims that it sufficiently appears in the foregoing paragraph of the will that the legacy to Lawton was intended to be

conditional on his rendering services in the collection of the claim against China, and to be payable only out of sums he might collect, and that, the conditions of service and collection not having been performed by Lawton, his legacy should not be paid.

Lawton's executor, on the other hand, claims that the legacy is absolute and not conditional; the amount of the legacy being measured by a percentage of the amount collected. He also points out that the services referred to in the will were for obtaining something from his brother's estate, not from China; and claims that the testator referred to Lawton's procuring assignments to the testator of the interests of his mother and sister in the claim.

On the issue thus presented the contestant claims that the decision of Surrogate Thomas, sustained by the Appellate Division and Court of Appeals, directing the filing of an account herein determined the status of his testator as legatee. There is no question the surrogate had jurisdiction to make the determination. Matter of Estate of Comins, 9 App. Div. 492, 41 N. Y. Supp. 323. But the decision on the application for an accounting did not require such a determination. A prima facie interest in the estate disclosed by the moving papers was sufficient to justify the order for an accounting. Matter of Irvin, 68 App. Div. 158, 74 N. Y. Supp. 443; Matter of Callahan, 66 Hun, 118, 20 N. Y. Supp. 824; Bonfanti v. Deguerre, 3 Bradf. Sur. 429; Burwell v. Shaw, 2 Bradf. Sur. 322; Matter of Kipp, 17 Misc. Rep. 491, 41 N. Y. Supp. 259, affirmed Kipp v. Peabody, 5 App. Div. 625, 39 N. Y. Supp. 1126.

And the surrogate's reference in his opinion to the bringing in of other parties and to the defenses that could be tried on the accounting indicates that he did not intend to determine the status of Lawton as legatee. · It is apparent, however, that the surrogate entertained no doubt from the record that Lawton was a legatee.

Thus the question is properly before me whether the legacy to Lawton is conditional, dependent on his rendering services and making collection of the Chinese claim, or whether the legacy is absolute. The answer seems to be quite plain. The disposing clause is couched in language appropriate to a bequest. It imposes no condition; it suggests no consideration for the legacy. The testator then proceeds to describe the effect that the legacy shall have, namely, to discharge any obligation to Lawton for services. As to this effect the testator is not very specific and the language employed not very appropriate. The statement that the gift is "in lieu" of services is bad English, and we are left in the dark as to whether the services meant by the testator had been rendered or were to be rendered 'or both. This uncertainty might call for critical interpretation were Cyrus. Lawton here pressing a claim against the estate for services rendered in the matter specified in the will, but offers no occasion for nice consideration here. The will purports to make a bequest, and the bequest does not fail because the testator has given reasons for it that are not quite clear. The court does not seek reasons for a bequest. The testator is free to give with or without reasons and for reasons quite insufficient or obscure. Reasons enough, however, appear from the will to explain the bequest. Cyrus Lawton was the testator's friend who had served him as attorney, and might perhaps be of further service to his estate.

Thus the contention of counsel for the executrix that the legacy is plainly conditioned on Lawton's making the collection is quite inadmissible. He would write a new will; he would turn a gift into a payment for services; he would make the testator's general reference to services mean only services to be rendered; and he would change the subject-matter of the services from a procurement from Gen. Ward's estate to making the collection from China. He would change the basis of computation from the total amount collected from China by anybody for the estate, to the total amount collected by Lawton.

The executrix has sought to introduce evidence of a conversation had between the testator and Cyrus Lawton at the time the will was drawn, at which she was present, and to show by the statements of the testator and Lawton what was intended by the paragraph. Her counsel would avoid the rule against the admission of this parol evidence on the ground that the contestant has opened the door for it by the allegations in his petition and

amended petition on which the order for the accounting herein was granted. The allegations referred to set up the rendition of services by Lawton to the testator in obtaining assignments from the mother and sister of Gen. Ward of their interest in the claim, and which allegations, it is claimed, create a latent ambiguity as to whether the testator meant obtaining the moneys from his brother's estate or obtaining the moneys from China. To resolve this latent ambiguity, the testimony of Mrs. Amidon is offered. The evidence is not admissible. The allegations of the petitions in regard to these services were surplusage. They may serve to identify the Cyrus Lawton named in the will, but were not necessary to establish the status of Lawton as legatee. No proof in support of these allegations is required to sustain the legacy. Moreover, the purpose for which the evidence is offered is not to explain but to reform the will. The testator does not describe the services as rendered in obtaining the moneys from China as the accounting executrix would prove, but from his brother's estate. If the testator made a mistake in his will, in its terms, or in supposing that Lawton had a claim for services when he had not, parol evidence may' not correct it. Board of Missions v. Scovell, 3 Dem. Sur. 516 at 519. As stated by Redfield, 1 Wills, § 41: "Although the intent of the testator is to govern, it must be the intent expressed in the will, and not the actual intent as shown by extraneous circumstances and proofs."

If the words of the will mean what I find them to mean, the suggestion of fraud on the part of Cyrus Lawton in drawing the will and in explaining its meaning to the testator and of mistake on the part of the testator in adopting the language so prepared for 'him are not triable here. Such issues belonged to the probate proceedings, where the legacy to Lawton might have been rejected if procured as charged. Burger v. Hill, 1 Bradf. Sur. 360.

Our courts have not followed the decisions of other jurisdictions which hold the legatees in such cases trustees for the rightful beneficiaries. Post et al. v. Mason et al., 91 N. Y. 539, at 550, 43 Am. Rep. 689.

The foregoing considerations dispose of the evidence offered by Mrs. Amidon on general principles and -without reference to the special rule of evidence found in section 829 of the Code of Civil Procedure. But this section is also a bar to the evidence. Mrs. Amidon is personally the party in interest, and may not waive as executrix the benefit of the section. The issue is not over the distribution of a fund in court, for the account shows that the executrix has paid out the whole estate, and seeks to be allowed the payment. Section 829 therefore applies. Matter of Smith, 153 N. Y. 124, 47 N. E. 33.

The foregoing conclusion brings us to a consideration of the issue over the amount of the legacy. The language of the will is:

"I give and bequeath to my friend, Cyrus Lawton, ten per cent. of all moneys hereafter received from China belonging to me in lieu of all fees and other charges by him made in obtaining the same from my brother's estate."

The issue here is whether this is a bequest of 10 per cent. of the gross payment by the government of China, or 10 per cent. of the amount received by the estate after deducting the proper expenditures made in collecting the claim. It is argued by the contestant that the computation must be made on the gross payment by China, because this amount alone corresponds to the description in the will, namely, "all moneys hereafter received from China belonging to me."

The principal item of deduction claimed by the estate is an item of about $184,000 paid to Hon. John W. Foster, as attorney's fee, for the collection of the claim; his fee being 50 per cent. of the amount collected. It is not seriously disputed that the fee was reasonable. But it is claimed by contestant that the fee should not be deducted from the gross payment by China in order to arrive at the sum upon which the legacy to his testator is to be computed. Counsel have submitted elaborate arguments on the two sides of this question, but little real authority on the point. We are left to find the intent from the will itself in the light of its phraseology, and the circumstances of the testator. Looking at the question in this way, I think it cannot be said that, in any real sense, this $184,000 received by the attorneys belonged to the estate when it was received from China. The claim at the time of decedent's death was unliquidated, for it was subject to a claim of set-off on

an uncertain amount. Before it was liquidated, a contract of employment had been entered into with Mr. Foster by which he became entitled to one-half of any sum collected. Thus, before right of the estate was determined in any definite sum, there had attached the right and lien of these attorneys to one-half of any collection. Under this state of facts, it is but a legal fiction to regard this money as received at all by the estate. Mr. Foster, indeed, had a power of attorney from the executrix; but he made the collection himself, and, when collected, the money belonged to him and his associate, and not to the estate. He did not remit his share to the executrix, and she had never had any right to it. The amount paid Mr. Foster should therefore be deducted from the gross payment by China in computing the legacy to Cyrus Lawton.

There are also other charges which the executrix claims should be similarly deducted. These are expenses incurred in the preparation of the accounts against the Chinese government, traveling expenses of the executrix, and a payment of $36,800 alleged to have been made to J. R. Amidon, the husband of the executrix, for services in preparing a statement of the claim for use in securing attorneys for the estate.

Assuming for the moment that these charges are proper, the inquiry is: Should they be deducted from the fund before computing the legacy to Cyrus Lawton? They differ from the fee of Mr. Foster only in the respect that the moneys expended were actually received by the executrix and applied by her—in the one case to the reimbursement of her expenses and in the case of Mr. Amidon, as she claims, to the settlement of his fee. So far as they are proper items of expenditure they are charges against the fund and reduce the amount the testator had to bestow. It is not necessary, I think, to follow counsel for the executrix through their elaborate argument on this point. I readily concur in the result they reach. In the absence of language showing a contrary intent, the fair construction of a legacy measured by a percentage is that the percentage is intended to be computed on the amount the decedent is free to bequeath. Otherwise, a legacy purporting to be 10 per cent. might absorb the whole fund the testator has to dispose of. In the case at bar, if the successive attorneys who from time to time have labored on this claim on the promise of large contingent fees had retained interests in the collection for their past services on surrendering the active control of the case, an arrangement neither unfair nor perhaps unusual, then 10 per centum of the gross collection might have consumed the whole fund. As it is, the expenses charged by the executrix amount to more than 60 per centum of the claim. Ten per centum of the collection, therefore, would amount to 25 per centum of the fund the testator had to bestow. It seems improbable that the testator intended such a result in a gift of 10 per centum. Contestant's counsel, however, points to the fact that in the second paragraph of the will the testator bequeathed one-sixth of the "net proceeds" to his sister and claims that the failure of the testator to use the word "net" in the paragraph under construction creates a fair inference that the "net" was not intended as the basis of computation of this legacy. I draw a different conclusion from the legacy to the testator's sister. I think the fact that the testator has given another definite portion out of the fund, namely, a sixth of the net proceeds, shows that he did not intend the gross proceeds to be the basis of the legacy to Lawton; for, as we have seen, this legacy might have absorbed so much of the net proceeds that there would not be a sixth left to go to the testator's sister. Moreover, the widow as residuary legatee was entitled to about 70 per cent. of the Chinese claim. In the event just assumed she might get no part of it, the whole being absorbed by legatees of a sixth and a tenth part only. If, on the other hand, both legacies were intended to be computed on the net, then all take effect in full measure. They do not conflict, and there is no question of abatement. We have further to remember that, though Cyrus Lawton was the friend of the testator, the other legatees of this fund were his sister and his wife; and a construction that favors them, other things being equal, is to be preferred.

Contestant's counsel points to the alleged contract between the executrix and her husband for his services in language similar to the will and to the

construction which they have put on it in their testimony and in the account, as a precedent for the construction of the will contended for by the contestant. This tu quoque argument is without merit. The meaning of the testator is to be determined by the ordinary use of the words and not by the practice of the parties to this proceeding.

There remains to consider the question whether the payment of $36,800 by the executrix to Mr. Amidon as a fee should be deducted from the sum collected before computing the legacy to Cyrus Lawton. The services of Mr. Amidon commenced in the winter of 1877–78, about three years before his marriage to the executrix. At that time he was a personal friend, and a frequent caller, but was not affianced to her. He examined a mass of papers so voluminous as to fill two large trunks, and many of them very illegible from being written closely in a fine hand on two sides of very thin paper. He also prepared a statement of fact which was later of use to the several attorneys for the estate, in preparing a petition submitted by the executrix to Congress (contestant's Exhibit No. 19), and in further prosecuting this claim, Mr. Amidon seems to have worked off and on for a year or more in sorting these papers and gathering data from them, as he could find time in the intervals of his regular employment, which was that of a hat manufacturer and retailer. The accounting executrix claims that these services were rendered by Mr. Amidon with the expectation of reward pursuant to a conversation had with him when the services were undertaken. She testifies (page 94) that she told him if he would fix the case so that any lawyer would take it (as she did not feel like putting out any money on an almost hopeless case) if she ever got any money she would give him 10 per cent. of everything that came from China. He replied he would do it. Mr. Amidon narrates this conversation in substantially the same terms. The agreement was not reduced to writing, and there is no real evidence of any further conversation on the subject until after the money was collected. The money was collected in five nearly equal installments beginning January, 1903, and ending March, 1904. Mr. Foster's fees were taken out of each payment. The legacy to decedent's sister was paid in 1904. The fees of Mr. Amidon were not paid then. More than three years after the money was collected a conversation occurred between Mr. Amidon and his wife which he describes as follows:

"Q. In what way was the amount paid to you? A. Orally. My wife said to me, 'Rufus,' she said, 'you were ill last year.' I was very ill, and I went to Europe, and she was ill the next year, in 1906 in the spring of 1907—I know it was before we went to Europe in that year—my wife made this remark to me, 'Rufus, the money has all been paid in and there is one thing, as a duty, I want to perform to you, and that is,' she says, 'I want you to understand that 10 per cent. of that money received from China I want you to understand that you are entitled to 10 per cent. of the gross amount received from China.' She says, 'You have done the work, you have done more work than all the lawyers put together, really, because you made it possible. I thank you for your work and I want you to have 10 per cent. of it from whatever there is of mine, to belong to you.'" (Page 152.)

The payment itself was not made at this time, nor indeed till three years later. Mr. Amidon had invested his wife's money from time to time, and at the date of this interview had some $33,000 in coupon railroad bonds in a safe deposit box held in their two names, and he had also an account standing similarly in the Nassau Bank. Three years later on April 26, 1910, he sent his broker $2,500 and ordered them to buy some stocks. About a week later he sent them $1,500 for other stocks. On June 8th, he sent them $34,-359.29, and by that date they bought for him 373 shares at a cost equal to the total amount of the three payments. To assist in paying for these stocks, in June, 1910, he sold for the price of $32,719 thirty-three bonds that had been the property of Mrs. Amidon. The payment to his brokers exceeded the amount he claimed as due him on his contract by some $1,600. He explains that his wife owns the excess. The stock was all taken in his name, but he was accustomed to hold his wife's stock that way.

Several points are to be noted in considering this transaction. In the first place, there is no apparent reason why the fee to Mr. Amidon if earned by

the contract testified to should be computed on the gross and not on the net collection. The language of the contract as testified to by the parties, "ten per cent. of everything that came from China" and "ten per cent. of whatever money is received," makes out no stronger case for treating the gross payment by China as the basis of computation in settling for Mr. Amidon's services than in settling the legacy to Cyrus Lawton. This legacy was "ten per cent. of all moneys hereafter received from China belonging to me." It is not conceived how the words "belonging to me" work any change of substance, for both the testator and executrix were dealing merely with the funds of the estate. The authorities, moreover, relating to contracts for attorneys' fees, cited by Mrs. Amidon's counsel against the use of the gross payment as the basis of computation in the Lawton case, as for instance Deering v. Schreyer, 171 N. Y. 451, 64 N. E. 179, would seem to be even more potent in the case of Mr. Amidon, for his claim rests solely in contract.

In the next place, the marriage of the parties which took place shortly after the services were rendered invites close scrutiny of the transaction with Mr. Amidon, for the payment alleged is to her own husband, and the burden is on the executrix to establish both a contract and its propriety before it can be allowed to the prejudice of a legatee. We are not dealing with an issue between the legatee and Mr. Amidon, for Mr. Amidon says he has been paid. Viewed in this light, I think the executrix has not sustained the burden of proof. The indefiniteness of the arrangement, making it impossible to determine whether the compensation was intended to be based on the gross or on the net recovery; the failure of the parties to reduce the agreement to writing; the failure of Mrs. Amidon to pay and of Mr. Amidon to ask for his share when and as the moneys were collected; the conversation as testified to, held several years after the moneys were collected, which gives the impression that Mrs. Amidon was anxious to recognize her husband's services by a handsome donation out of her own moneys; the manner in which the payment was made, if indeed it can be said to have been made at all; and the date of payment, namely, after the estate of Cyrus Lawton had set up a claim to his legacy and these proceedings had begun to compel payment; coupled with the fact that the payment, if allowed, would reduce substantially the legacy to Lawton—these bear more the stamp of a voluntary recognition of services than of payment of a debt. Mrs. Amidon claims that she thought she was the only person interested in the estate after the legacy to her husband's sister had been paid, and that therefore the usual precaution of a written agreement could be safely intermitted. This is probable enough and prevents a finding that no contract such as she testified to was made. But this is not sufficient. To sustain the allowance she claims the burden is on her to establish that a definite contract was made, and this I think she has failed to do.

But if Mrs. Amidon were entitled to the benefit of the doubt as to the making of the contract, I think such a contract should not be enforced against this legatee. Mr. Amidon was not a lawyer. He was a hatter, and had no previous legal experience. The executrix had no right to parcel out so large a share of the claim on a contingent fee for nonprofessional services of the character and under the conditions in this case. The work involved appears in the main to have been either such as it was her duty to do as executrix or such as the attorney would do in the preparation of the case. Such attorneys she was able to obtain from time to time—several in succession—and, as each one failed to make the collection, he withdrew from the case without retaining an interest for services rendered. Mr. Amidon's compensation, though contingent on success, does not seem to have been subject to the condition of success within any given time. Success anywhere, at any time, by whomsoever, appears to have been thought enough to give his claim full vigor. A closer inquiry into the services of Mr. Amidon for which the charge was made only reinforces the conclusion that so large a payment was not justified. His services consisted in the examination of papers difficult to read and so voluminous as to fill two trunks and the preparation of a statement of the case. The examination of the papers was, of course, one of the duties of the executrix, a duty which she could doubtless have performed herself with

the assistance of counsel when obtained and for the procuring of which she could not be allowed as an expense any substantial percentage of the recovery. She claims, however, that counsel could not be procured until such a statement of the case was prepared, and that such a statement was impossible without the examination of the documents made by Mr. Amidon to obtain the facts upon which the statement was drawn. She does not support this by proof of the refusal of any counsel to take her case. Mr. Amidon was not able to produce the original statement which he prepared, but testifies that it was substantially the same as the petition to Congress (contestant's Exhibit No. 19). There is danger in accepting the recollection of the witness on a point of that character after a lapse of so many years, but without detracting from the part he claims to have played in the preparation of the petition, and without detracting from the merits of the paper itself, I am unable to find that this paper played as important a part in the collection of the claim as the executrix contends. We must remember that, at the time Mr. Amidon began his labors, the work of establishing the claim had already been performed. The claim itself, evidenced by the dying declaration of Gen. Ward, had been approved by the first board of arbitrators, and by the second board subject only to an accounting of the funds formerly in the hands of Henry G. Ward, which the arbitrators considered a proper set-off. This accounting prepared by an expert accountant, Mr. Telfair, had been submitted to the Chinese authorities. The only obstacle to collection of the claim was the reluctance of the Chinese government to settle an old debt.

The petition whose authorship Mr. Amidon assumes, and to secure the preparation of which the contract with him was made, comprises nine printed pages. It sets out the military services of Gen. Ward, his death and will, his claim against Woo and Ta Kee, the appointment of executors, the acceptance of the administration of the estate by Mr. Freeman, his presentation of the claims, and their admission by Woo and Ta Kee. It describes the claims of merchants for supplies furnished the army, the arbitration of these, and the submission of the Ward claim along with them, the fact that the Ta Kee claim was not submitted at the same time, the counterclaim set up by Woo and the funds intrusted to Henry G. Ward, the latter's services, his letter of account to his brother, the circumstances under which the claims were resubmitted to arbitration, Henry G. Ward's refusal to furnish the arbitrators with the account, the finding of the second arbitrators, Mr. Seward's visit to the United States, and Henry G. Ward's death, preparation of his accounts by Mr. Telfair, and the submission of these to the Chinese officials. This seems to constitute about the substance of the petition. All of these matters will be found touched on in the first 17 pages of Senate Document No. 43, (contestant's Exhibit No. 1), published apparently early in 1878, about the time Mr. Amidon began his services. Many of the matters are set forth there at greater length and with more distinctness than in the petition. The preparation of the petition was therefore no indispensable service.

Mr. Amidon testifies that he devoted much time and attention to the preparation of the claim against Ta Kee and that only when his statement had been prepared did he discover that the claim had been settled in the lifetime of Henry G. Ward, in the arbitration consented to by his father. The two letters of Consul General Seward printed at pages 3 and 6 of Senate Document No. 48 (contestant's Exhibit No. 1), and which he should have seen, both state that the claim had been settled in Henry G. Ward's lifetime.

Thus although I cannot find Mr. Amidon's services to be so valuable as claimed, yet they were doubtless onerous and consumed a large amount of his spare time for over a year. Part of these services could not well have been performed by the executrix, and her attorneys might not have been willing to perform such part at least under the agreements on which they acted. I have no doubt that they benefited the estate. Moreover, though I cannot find sufficient evidence of the contract testified to by the executrix, I am inclined to believe that these services were not rendered entirely gratuitously but that it was understood Mr. Amidon would be paid something for them.

I have found that a contract for the payment of 10 per cent. would be so improvident that if made it should not be enforced to the prejudice of an ob-

148 N.Y.S.—44

jecting legatee. Finding no measure of compensation in express contract, and measuring this compensation on a quantum meruit, I cannot under the rule take into consideration the fact that the services were contingent upon success to increase the allowance. O'Neill v. Crane, 65 App. Div. 358, 72 N. Y. Supp. 812.

I have accordingly allowed as a proper expense of administration for the services rendered by Mr. Amidon $1,500.

This conclusion is quite consistent with important services for which this allowance is not made; and which may naturally have prompted Mrs. Amidon to make the payment she claims to have made. The services I mean include those rendered since his marriage to Mrs. Ward and in connection with her labors in the collection of the claim, but for which no amount is charged against the estate.

During the years that intervened between Mr. Amidon's first connection with this case and the collection of the money, the accounting executrix, as Mrs. Ward and later as Mrs. Amidon, at times exhibited considerable activity in the prosecution of the claim. In the early part of 1880 she placed the claim in the hands of Mr. Frank W. Hackett, a lawyer of Washington, who took it on a contingent fee of 25 per cent., and who laid it before the State Department. In connection with this, Mrs. Amidon made several trips to Washington from her home in New York, had numerous interviews with her attorney and with the several Secretaries of State, who successively held office during the period—Messrs. Evarts, Blaine, and Bayard. Mrs. Amidon' terminated Hackett's employment in 1883, and some time during the three years following she employed Mr. George H. Glavis of Washington, D. C., and Mr. John H. Flagg of New York, to collect the claim on a contingent fee of 50 per cent. After having the claim in their hands for several years, they returned it to Mrs. Amidon. During this interval a fund known as the Canton Indemnity Fund was deposited with the United States by China and paid out by our government in settlement of the claims of our citizens against the government of China. Among the claims so paid was that of one Charles E. Hill for the use of a gunboat, the Keor Jeor, furnished by him in the aid of Gen. Ward's military operations. Mrs. Amidon had some interviews with Mr. Hill and expected that her claim would be presented along with the Hill claim; but it was not done, and the allowance of the Hill claim and the failure to present the Ward claim at the same time was regarded by Mr. Secretary Blaine as so far prejudicing the Ward claim as to discharge the State Department from pressing it further on the government of China. Nothing further of importance was done until the claim was taken up by Mr. John W. Foster and prosecuted to a successful termination after the Boxer Rebellion of 1900. In conducting this work Mrs. Amidon was called upon to make several trips to Washington. She invoked the influence of the Governor and Senators of Massachusetts and of prominent people of Salem, Mass., the home town of Gen. Ward, to stimulate the interest of the State Department, and this necessitated one or more trips to New England. She had interviews with Mr. Hill and the several attorneys, and did other work which it is unnecessary to describe. In some of these endeavors Mr. Amidon took part. How large a part is not shown, but he makes no claim for such services. What I have allowed of the payment to him was for work done prior to his marriage to Mrs. Ward, to which the contract testified to both by him and Mrs. Amidon referred. In connection with these services of Mrs. Amidon I have allowed her $1,000 for her disbursements. I understand the allowance of this latter item is acquiesced in by both parties.

Argued before INGRAHAM, P. J., and McLAUGHLIN, SCOTT, DOWLING, and HOTCHKISS, JJ.

Charles O. Maas, of New York City, for appellant.
William S. Maddox, of New York City, for respondent.

PER CURIAM. Newbury D. Lawton, as executor of the last will and testament of Cyrus Lawton, deceased, presented to the Surro-

gate's Court a petition to require the executrix of Henry G. Ward to account as such executrix and to pay to the petitioner the amount of a legacy directed to be paid to the petitioner's testator by the last will and testament of Henry G. Ward, deceased. The executrix was required by the surrogate to file an account to which objections were filed, and the account and objections were then referred to a referee to hear and determine all questions arising upon the settlement of the said accounts.

The testator by his will gave and bequeathed to Cyrus Lawton, the appellant's testator, "ten per cent. of all moneys hereafter received from China belonging to me in lieu of all fees or other charges by him made in obtaining the same from my late brother's estate." The referee held that by this bequest the petitioner's testator was entitled to receive 10 per cent. of all moneys received by the testator or his representatives upon the China claim after deducting the proper expenditures made in collecting the claim. He then determined what in his opinion were the proper expenditures to be deducted from the gross amount paid by the China government, and awarded to the petitioner judgment for that amount. Both the petitioner and the executrix excepted. The learned surrogate overruled the exceptions by the executrix, but sustained the exceptions by the petitioner, and allowed the petitioner 10 per cent. upon the total sum paid by the China government.

We concur with the referee in his disposition of the questions presented. As the whole question is thoroughly discussed in the referee's opinion, further discussion is unnecessary except so far as to say that we concur generally in the conclusion at which he arrived.

The decree of the surrogate is therefore reversed; the exceptions taken by the petitioner to the report of the referee are overruled; the referee's report is confirmed; and a decree directed in conformity therewith, with costs to the executor accounting payable out of the estate.