Breitel, J. (dissenting).
I dissent and vote to reverse and grant a new trial for prejudicial error in the admission into evidence of hearsay statements of a nonparty to the action. Since there was a substantial issue of fact upon the trial and the statements went to the fulcrum of the case, they may well have been decisive of the issue presented to the jury.
The admissibility of the extrajudicial statements depends upon whether, in actions against sureties, there is or ought to be some special exception to the general rules excluding hearsay statements. Since 1875, this court, relying on landmark precedents, has allowed of no such exception (Hatch v. Elkins, 65 N. Y. 489, 496). In the Hatch case the general rules excluding hearsay evidence were followed, but it was also observed, in language now classic, that statements made by the principal “ during the transaction of the business for which the surety is bound, so as to become part of the res gestae are competent *526 evidence against the surety; but his declarations subsequently made are not competent.” (p. 496). This was and still is the general rule (Ann.: Extrajudicial Admissions by Principal as Evidence against Surety, 60 A. L. R. 1500, 1504, 1509, 1514, 1521; Ann.: Fidelity Bond-Evidence, 65 ALR 2d 631 et seq.; 50 Am. Jur., Suretyship, § 196; 31A C. J. S., Evidence, § 366).
In this case, plaintiff Letendre owned a gasoline station in upstate New York and also a restaurant in Florida. From September, 1962 to May, 1963 Letendre remained continuously in Florida. He left in charge of the gasoline station for that period one Tremblay, an employee of his since the prior January, for whom he had obtained a fidelity bond from defendant surety. After his return to New York, Letendre reviewed the daily and monthly records of the receipts and disbursements. These contained computations of the periodic surpluses of receipts over disbursements, and indicated that surpluses had been deposited in Letendre’s bank account. The indicated deposits did not agree with the actual bank deposits. And, of course, there was a consequent shortage in the bank account. Subject to various adjustments, Letendre claims an unexplained discrepancy or loss in the range of $5,600 and upward. Tremblay’s bond was in the amount of $5,000, and was conditioned on ¡the commission of dishonest or fraudulent acts by him.
The fact of the discrepancy between the station records and the bank records is undisputed and is, therefore, a conclusive datum in the case. Very much at issue on the trial, however, was whether there was a credible explanation for the discrepancy.
Letendre testified and admitted that substantial disbursements, upward of $3,000, were properly made by Tremblay and, for reasons not disclosed, were not recorded in the station records. Most of these were payroll disbursements. Tremblay, called as a witness by Letendre, testified that the whole discrepancy was explained by such unrecorded, but authorized, disbursements. If that were all to the case, and if Tremblay’s trial testimony were believed, plaintiff must, of course, have failed to recover. The issue, one of credibility of Tremblay, was for the jury to decide.
But before Tremblay was called as a witness, Letendre offered in evidence two written statements by Tremblay in which he admitted stealing the money, thus accounting for the dis *527 crepancy. Interestingly, Tremblay at all times held another full-time job, and he denied that he had any extraordinary need for additional funds. He could not explain when, why, or for what he had spent the stolen funds. These written statements were made long after the alleged larcenies, and months after Letendre had returned to New York, but while Tremblay was still employed by Letendre, although no longer as manager. The statements, of course, were in the classic form of extrajudicial hearsay statements, the contents of which purported to narrate what had happened in the past. However, in his trial testimony, Tremblay sought to explain these inculpatory statements by his feeling when he made them that, as the manager in charge, he was morally responsible for what appeared .to be unresolvable discrepancies on the records and for poor management in having too much “ help ”, that is, employees.
Before making the inculpatory statements Tremblay had made two other written statements to the surety’s claims agent. Each of these was exculpatory and denied any wrongdoing. The later and inculpatory statements were also made to the claims agent, but only after Letendre had brought the still-employed Tremblay to the claims agent and had said that Tremblay had something to reveal. The earlier exculpatory statements were received in evidence eventually on the offer of defendant surety.
Less than two weeks after the first of his inculpatory statements, Tremblay was dismissed from Letendre’s employment on the advice of Letendre’s lawyer. There were other circumstances established relating to the suggestion that Tremblay be criminally prosecuted, but these are relevant only on the issues of credibility of Letendre in the case. They do not bear on the legal question whether the inculpatory statements were admissible on the case in chief and probative of an operative fact in plaintiffs cause, as distinguished from being used to impeach Tremblay. He, although called as a witness by Letendre, was hardly a friendly witness on the trial. Defendant surety rested on plaintiff’s case.
The trial court charged the jury that it might weigh the exhibits in the case, and particularly the several statements taken from Tremblay. The jury returned a verdict in favor of plaintiff Letendre for the amount of the bond.
*528 The Appellate Division, agreeing that the admission of the Tremblay statements violated the rule in the Hatch case (65 N. Y. 489, 496, supra), held that the law was in some doubt and propounded a new special rule for fidelity bond cases, stressing that the statements were made while Tremblay was still employed by Letendre. It also held that defendant had failed to make proper objection or preserve its objection to the admissibility of the statements.[1]
The first issue, then, is whether defendant made proper objection. When an inculpatory statement was first offered, defendant objected generally. The objection was sustained. Plaintiff’s attorney indicated that he had some law to discuss on the issue. A recess was called and the jury excused until after lunch. When the trial resumed, the court stated that it was allowing the statement to be introduced, citing Grant’s Sons v. Phoenix Assur. Co. (25 A D 2d 93). Defendant’s attorney promptly asserted that the Grant’s case was not pertinent, that he relied on the Hatch case (supra) and on Stanley Co. v. National Sur. Corp. (179 Misc. 493) and the authorities there cited which followed the Hatch rule in fidelity bond cases. True, he did not stop there, but went on to argue the inapplicability of the Graft’s case. Overall, however, the clear and specific objection had been made that the Tremblay statements were not part of the transaction (res gestae) and were thus inadmissible as hearsay. Actually, since the basis for the objection was not curable, there was questionable need to make the objection specific (cf. 4 Weinstein-Korn-Miller, N. Y. Civ. Prac., par. 4017.04; Richardson, Evidence [9th ed.], § 543).
*529 The next issue is whether defendant preserved its objection. At the close of the proof, both sides having rested, defendant moved to strike the inculpatory statements and renewed its objections made at the time of their introduction. The motion was denied. After the verdict was returned, motions were reserved for a later day, and at that time defendant moved to set the verdict aside, inter alia, on the ground that the inculpatory statements had been improperly received, citing the Hatch case (supra), the Stanley case (supra), and still another case. The only thing defendant had not done was to take a specific exception to the charge on this issue, a futile and legally unnecessary step in view of the court’s immediately preceding ruling rejecting defendant’s contention (4 Weinstein-Korn-Miller, N. Y. Civ. Prac., par. 4017.07, pp. 40-82 and 40-83, esp. n. 36, and cases cited). The objection was indeed preserved, and well beyond the necessity of making sure that the trial court was aware of defendant’s persistent contention that the inculpatory statements were incompetent.
As already suggested, the Hatch rule (65 N. Y. 489, 496, supra) not only is of long standing and generally followed but fits neatly into the general rules of evidence excluding hearsay (Tenth Nat. Bank of New York City v. Darragh, 1 Hun 111; Wieder v. Union Sur. & Guar. Co., 42 Misc. 499, 500-501; Marcus v. Fidelity & Deposit Co., 164 App. Div. 859, 861; Ann.: Extra-Judicial Admissions by Principal as Evidence against Surety, 60 A. L. R. 1500, passim, supra; Ann.: Fidelity Bond-Evidence, 65 ALR 2d 631 et seq., supra; 31A C. J. S., Evidence, § 366, supra; 21 N. Y. Jur., Evidence, § 313; 57 N. Y. Jur., Suretyship and Guaranty, § 275; Richardson, Evidence [9th ed.], § 319). The so-called res gestae exception is not a true exception but relates to the verbal acts of the faithless employee at the very time that he is conducting his employer’s business. The Grant’s case (25 A D 2d 93, supra), insofar as it introduces the factor of the employee’s continued employment, rests on a doubtful logic and an even more doubtful pragmatic basis.[2] Certainly, *530 analogous experience with the rules governing admissions by agents suggests that the status of employment by itself is not a determining factor. It. is old law that the mere fact that an employee makes a statement during the term of his employment does not make the statement admissible against the employer, unless it is also made during the course of and pursuant to his employment (Richardson, Evidence [9th ed.], § 329, and cases cited). From a practical point of view, the continued employment of the declarant makes the statement less reliable, rather than more, by enhancing the risk of collusion. And the facts of this case exemplify that increased risk.
To be sure, an employer situated as Letendre may have a difficult problem of proving both his loss and that it was one covered by the bond. In this case, however, the discrepancy was shown, prima facie, by the records kept or supervised by Tremblay. It is not true, therefore, that plaintiff could not make out his case without the questioned statements. He could also have offered the testimony of Tremblay in chief as he did, if only to show that he was offering all available proof. Then, if he chose, he could offer the inculpatory statements to impeach, but only to impeach, this obviously unfriendly witness. The difference would be, not only in the order of the proof, but that the jury must also have then been instructed to limit the use of the inculpatory statements to testing the credibility of Tremblay and not to accept them as evidence of the facts they purported to recite. In some cases, this distinction might not have been too important; but here the distinction was vital, because Letendre’s case had serious vulnerabilities.
Letendre admitted that there were authorized, but unrecorded, payments, and hence the record discrepancies alone were not the strongest evidence of Tremblay’s misconduct. Letendre never denied Tremblay’s testimony that throughout Letendre’s stay in Florida Tremblay sent him, unopened, the bank statements and vouchers, in addition to the monthly records of receipts, disbursements, and bank deposits. Ralph Guido, the ‘ ‘ bookkeeper ’ ’ for the gasoline station, never testified, although it was his job to transcribe the daily records into the monthly records, and note the claimed deposits. Letendre never explained why certain authorized disbursements were not recorded, although the station’s cash register ran a continuous tape, records of daily and *531 monthly receipts and disbursements were maintained, and a perpetual inventory was kept on a daily basis. One of the concededly authorized, hut partly unrecorded, payroll items was compensation for Tremblay’s brother, Andre.
Letendre’s explanation for retaining Tremblay, after discovering the discrepancies, raised a grave issue of Letendre’s credibility for the jury. Pointing in a contrary direction is the fact that Tremblay’s continued employment was on the basis that his wages would be credited to the shortage. The use of Tremblay was particularly significant since the station operated 24 hours a day on three shifts and, according to the uncontradicted testimony, one man would hold each shift (with all the opportunities that there were for larcenies).
Critical to Letendre’s case was the establishment of Tremblay’s misconduct, because tie bond covered him alone. A larceny of another employee, unless condoned or abetted by Tremblay, would not entitle Letendre to recover. Hence, the significance of the inculpatory statements. The evidentiary-fact issues were many in this otherwise simple case, and the inculpatory statements, if received in evidence without limitation, and so weighed by the jury, might well have had decisive effect.
In any event, since the court is now propounding a new rule of evidence, not considered or utilized by the trial court or the Appellate Division, a new trial should be required as a matter of elemental justice. The trial court and the Appellate Division reviewed the trial motions and the jury’s finding of facts on various bases, most of which this court now holds erroneous. As already observed, the issues of fact in this case were not nominal but very real. This might not be so important because, whether the basis was erroneous or not, the trial court’s ruling that the hearsay statements are to be considered as evidence in chief has finally been upheld. But more important is the Appellate Division’s erroneous holding that defendant had failed to preserve its objection, thus depriving defendant of its right to a review of the facts by that court. Equally important too was the misleading of defense trial counsel who relied on the general principles of evidence law obtaining in this State and elsewhere.
Finally, if new exceptions to the hearsay rule, based on the broad admissibility of hearsay espoused by advanced thinkers, are to be propounded, the jury should be instructed on the variant *532 weight to he given extrajudicial statements, whether sworn or not, and trial testimony, sworn and subject to cross-examination. The considered justification for the hearsay rule as an adjunct to a system using lay juries to find facts should not be lightly overborne. Consequently, even if the abrogation of the hearsay rule is welcome, and perhaps it may be, it should not be done as a happenstance in achieving a result in a particular class of case and without balancing cautionary instructions to the jury.
Accordingly, I dissent and vote to reverse the judgment in favor of plaintiff and to grant a new trial.
Chief Judge Fuld and Judges Scileppi and Bergan concur with Judge Keating ; Judge Breitel dissents and votes to reverse and to grant a new trial in an opinion in which Judges Burke and Jasen concur.
Order affirmed.

. “In view of the variable state of the existing law, this court is determining that in an action on a surety bond a principal-employee statement is admissible regardless of res gestae or the termination of employment, but requires, as governed by the factual situation, instructions by the court as to the use and the purpose for which the statement is admitted. The employer, indemnified by the bond, is entitled to prove his action, but likewise the surety is entitled to be protected as to possible collusion between the employer and employee in attempting to recover under the coverage of the bond. (Cf. Marcus v. Fidelity & Deposit Co., 164 App. Div. 869; Grant’s Sons v. Phoenix Assur. Co., supra.)
“In the present instance, because of the failure of the defendant to make proper objections to the admission of the statements and to make appropriate requests to charge the jury, it is not necessary to consider how the statements should have been limited as to their proof of the facts contained therein.” (27 A D 2d 205, 206.)

. Grant's case also rested on other alternative grounds. One was that the declarants (faithless employees) were no longer available in the jurisdiction as witnesses. In this case, of course, Tremblay testified at the trial. Another was that the fidelity bond in Grant's case covered all employees during the term of employment. (25 A D 2d, supra, p. 96.)